Anthony M. Leo #W89456

S.B.C.C.

PO Box 8000

Shirley, MA.01464

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Anthony M. Leo,           )
            Plaintiff,    )
                          )
                          )
        v.                )
                          )
                          )
Guy W. Glodis, Sheriff of )
Worcester County; 6 John  )
Doe jail guards; 2 Jane   )
Doe nurses and John       )
O'Neill, LICSW, individually)
and official capacities.  )
            Defendants.   )

**COMPLAINT**

CIVIL ACTION NO. 07-11896 NG

### I.  PARTIES

1.)   Plaintiff, Anthony Michael Leo, is a prisoner of the
Massachusetts Dept of Corrections. He has been a sentenced inmate
since 03/14/07. At all times mentioned herein he was a pre-trial
detainee in the custody of the Sheriff of Worcester County.
(From 04/22/02 to 03/14/07). He is currently housed at SBCC

( Souza-Baranowski Corr Cntr), in Shirley, Massachusetts.

2.) Defendant, Guy W. Glodis, is the Sheriff of the Worcester county Jail in W. Boylston, MA. He is legally responsible for the operations of the jail, and for the welfare of all the pretrial detainees & inmates housed there. He is also responsible for implementing and monitoring of 103 Code Mass Regulations 900.00 through 999.00 at his facility.

3.) Defendant, John Doe, is a sergeant corrections officer at the Worcester County Jail. He was in charge of the "move team" members at all times mentioned herein, and was the supervising officer of the A-1 Housing Unit during the time the plaintiff was housed there.

4.) Defendant, John Doe, is a corrections officer at the Worc. County Jail. He was also a member of the "move team" used against the plaintiff and he worked in the A-1 & A-2 Housing Units while the plaintiff was housed there.

5.) Defendant, John Doe, is a corrections officer at the Worc. County Jail. He was a member of the "move team" used against the plaintiff and he worked in the A-1 & A-2 Housing Units while the plaintiff was housed there.

6.) Defendant, John Doe, is a corrections officer at the Worc. County Jail. He was also a member of the "move team" used against the plaintiff and he worked in the "Main Jail" while the plaintiff

2

was housed there.

7.) Defendant, John Doe, is a corrections officer at the Worc. County Jail. He was also a member of the "move team" used against the plaintiff and he worked in the "Main Jail" while the plaintiff was housed there.

8.) Defendant, John Doe, was the "facility administrator" or the "chief custody officer" of the Main Jail from 03/09/07 to 03/14/07. He authorized/ordered the "move team" to use force against me, and he also authorized the use of "4 point restraints" on the plaintiff on 03/09/07 to 03/10/07, in the A-2 Disciplinary Unit.

9.) Defendant, Jane Doe, is a nurse employeed at the Worcester County Jail. She examined the plaintiff at approx 10 PM on 03/09/07 while he was in full restraints in the A-2 Disciplinary Unit.

10.) Defendant, Jane Doe, is a nurse emplyeed at the Worcester County Jail. She examined the plaintiff at approx 1 AM on 03/10/07 while he was in full restraints in the A-2 Disciplinary Unit.

11.) Defendant, John O'Neill, is a MSW & a LICSW(mental health worker) at the Worcester County Jail. On 03/10/07, Mr. O'Niell examined me at 1 PM. At this time I was still in the A-2 Unit in full restraints.

12.) Each defendant is sued in their "individual" and "official" capacities.

3

## II.  JURISDICTION & VENUE

13.)     This civil rights action is authorized by 42USCA§1983, to
redress the deprivation, under color of state law, of the rights
secured by the Constitution of the United States. This action is
also authorized by 42USCA§1985(2)&(3) to redress injury or
deprivations caused by 'conspiracy to interfere with civil rights!.
The court has jurisdiction under 28USCA§1331 & §1343(a)(3). The
court also has 'supplemental jurisdiction' under 28USCA§1367 to
redress asserted state constitution, state law and Code Mass Regs
violations as well as the writted policies of the Worcester County
Jail.

14.)     The 'Central Division' of the United States District Courts
of Massachusetts (Worcester), is the appropriate venue under 28
USCA§1391(b)(2), because it is where the events giving rise to
these claims occurred.

15.)     The plaintiff also reserves his right pursuant to Rules 15
(a) and 19(a) Fed.R.Civ.P., for leave to amend this complaint to
properly identify the "Jane/John Doe" defendants after discovery
to add/delete defendants, to include more, or different facts, or
add new legal claims.

### III.   FACTS

**16.)**   On 04/24/02, I was committed to the custody of the Sheriff of Worcester County for want of bail on criminal charges. In June of 2002, I was transferred to the state prison system, pursuant to MGL.c276§52A, to await trial.

**17.)**   During the following 57 months awaiting trial I was moved from the county jail to MCI-Concord, from MCI-Concord back to the Worcester County Jail, back to MCI-Concord, to Old Colony Corr Center in Bridgewater, MA., back to the Worcester County Jail, and then back to MCI-Concord, back to Old Colony and on 01/09/07 I was sent to the Souza-Baranowski Corr Center in Shirley, Ma. This is where I was awaiting trial on 03/09/07.

**18.)**   On 03/09/07, I was sent to the SBCC receiving area where 2 Worcester County officers told me they were taking me back to the county jail. I was going back now for my trial on 03/12/07.

**19.)**   I told the officers that I did not want to go back to the jail before my trial as I would not be allowed to take all my legal work, hygiene items or my prescribed psychiatric medications. At the jail, I could not use the phone as my 'authorization' # would not be working and I could not live in the over-crowded, unsanitary and inhumane conditions. The lack of space & privacy at the jail causes extreme discomfort, and is severely 'punitive.' The over-all environment of the pre-trial housing areas.... gives one the

**23.)** Once we left the prison grounds the 2 officers in the van tried to engage me in conversation. I remained quiet. This seemed to bother them and they began driving erratically, hitting the brakes and the gas hard, swirving from side to side. This caused me to slide 'back & forth' on the floor, causing my head to slam into the steel divider. I could do nothing to stop this as my hands were secured behind my back. I received several lacerations to my fore-head which bled alot. This made the officers lauph out loud.

**24.)** Upon arrival at the county jail, the 5 "move team" officers pulled me out of the van by my feet. I was dragged into the jail's receiving area. My eyeglasses were taken and a black hood was pulled over my bleeding head. My sneakers were pulled off, and I was dropped on a gurney, face down. I was taken to the A-2 "disciplinary" unit.

**25.)** Once inside the unit I was picked up and placed sitting up on a raised plastic bed. The cuff were taken off and my hands were locked in steel cuffs on each side of the bed. The shackles were removed and placed in ones secured to the bed. Then leather straps were secured to my wrists & ankles and 2 more straps were secured across my legs and chest. All my clothes were cut off except for my boxer shorts. A helmet was secured to my head over the hood. It was approximately 5 PM.

**26.)** The 2 restraint beds are located in a steel cage in the day room of the unit. They are almost directly under 2 large windows. These windows were wide open. It was early March, and very cold out.

7

Completely immobilized, in only boxer shorts, made it even colder. I asked an officer to close the window, but I was just lauphed at. These windows remained open the entire 25 hours I was locked in the '4 point restraints'. I also asked to try and make a phone call to let my attorney & family know that I was no longer at SBCC. This request was denied.

27.)   At approximately 9:30 PM, 3 of the "move team" members came to 'visit' me. They started calling me nasty names and telling me I was a piece of 'sh*t', and that I should 'kill myself'. I continued to ignore them in the hope that they would get bored and leave me alone. This just aggravated them more. They started telling me that they were going to 'teach me a lesson', and that there was'nt any cameras watching me like at SBCC. They knew how to get away with 'stuff' and no one would believe me any way. I was spit on, and then an officer 'straddled' my head and release 'gas' in my face. This made them lauph hysterically. I was threatened with rape and death. I started to get scared.

28.)   This "torture" lasted until about 10:30 PM. It was time for the 2nd shift to go home. A few minutes after the officers left, I was checked out by a nurse. She took my pulse and checked the restraints. She noticed how tight they were and told a officer to loosen them. I also asked her to close the windows and for some food & water(dinner). I got none of my requests, restraints not loosened.

29.)   I remained in full restraints the entire night. I was not

8

allowed to stretch my limbs,a drink of water or to use the bathroom. I did not act out or misbehave in any way. I did not even make any noise. I thought if I behaved myself I would be released. I thought wrong. I remained cold, quiet and awake the entire night. I could not wait for my attorney to visit me in the morning and get me out of the restraints. At about 1:30 AM another nurse checked my pulse and left. I again asked her to close the windows, for some water and to use the bathroom. My requests were ignored.

30.) In the morning, all the other inmates were given breakfast but me. I pleaded to be allowed to stretch my cramping arms & legs and to use a toilet or bed pan. By about 11 AM I could not hold it any longer and was forced to urinate on myself and lay in it. I asked a Lieutanant who was in the A-2 unit if my attorney had called or came to see me. He told me attorney Guzman had come to visit me, but she was told she could not see me. I could not believe it. I asked to use a phone to call her or my family and was again denied.

31.) At about 1 PM a 'mental health' worker came to see me. He asked me how I was doing? If I was going to hurt myself? I told him I was not suicidial, but I wanted my psychiatric medications. I told him what had been done to me the day/night before, how cold I was, that I had not been allowed to stretch, eat, drink or use the toilet for 18 hours. That I was forced to urinate on myself and that I was currently laying in it, ect..... I showed him the cuts on my head and the injuries from the severely tight restraints. I told him that doing this to someone was illegal and asked him to release me. He told me he would check on my medications, and that

9

when I was released from the restraints I could go to a 'general population' cell. I did not need to be placed on a suicide watch. I had been incarcerated for almost 5 years without ever attempting to hurt myself, and I had just come from another prison where I was housed in 'general population'. (See Exhibit 'B' ).

32.)   I remained in restraints, and was not given any lunch as all the other inmates were. No one else came to see me or check on me. My muscles were cramping badly and I was in severe pain. I again asked to be released, to stretch out, for some water and for a call to my attorney. My pleas were ignored.

33.)   At 3:30 PM (2nd shift), 4 of the "move team" officers came to 'visit & harrass' me. They were all so happy to see me there still chained down, lying in my urine. They asked me how I liked the restraints? 1 of them said he was hoping I would be lying in something worse than urine. That made them all lauph. They said that if I promised to kill myself they would let me out of the restraints. They also told me that the newspaper had printed a story about me in the days edition.(03/10/07). They taunted me for about 15-20 minutes.

34.)   At 6 PM, after 25 hours straight in the restraints, I was told that I was going to be released. At 6:30 PM I was cuffed and shackled and escorted to the A-1 housing unit. (Suicide Unit). I told the officer that I did not need to be placed on a suicide watch and had been 'cleared' by mental health earlier. He told me

10

that the mental health worker (John O'Neill) had "changed his mind" and he had put me on an "A-Watch" for suicide risk.

35.) I was told to take off my underwear and given a 'burlap robe' to wear. I was told I could not have my eyeglasses. I was placed in a cell, suicide cell. The light in these cells remains on 24 hours a day, there is no desk, mattress or pillows. It was filthy and stunk. The cold water did not even work. I had to drink hot water. I asked for soap, toothpaste, toothbrush, razor to shave with and a wash cloth like all other inmates at the jail are given. I was told they did not have any. I could not even wash the dried urine off my body. I was given supper. I again asked to use the phone and was told I was not allowed to use the phone.

36.)    At least 4 of the 5 "move team" members were working in this unit, or in a unit close by because they enjoyed coming to see me every hour or so to torment me. All night, even on the 3rd shift, officers would kick my door, waking me up, every hour or so. I got very little sleep. Was not given any of my medications.

37.)    I was finally allowd to see my attorney at 11 AM on Sunday, 03/11/07. I was placed in hand cuffs behind my back and leg irons. I was given no clothes but I was given a pr of 'flip-flops'. This is how I was forced to remain through-out my attorney visit. I was not allowed my eyeglasses. In this condition, I could not hold, or read, any of the documents attorney Guzman had brought for me to review. Some was 'Discovery' that the A.D.A. had just turned over. She had photos that I had been fighting to get for 3 years, I could

11

not even see them. I told her what was done to me since 3 PM on friday. I began crying when I told her about what the "move team" officers had done to me, that I really thought they were going to hurt me, or kill me. I showed her the cuts on my head, wrists and ankles. I could hardly walk in the leg irons becuase the skin on my ankles was rubbed raw. (see exhibts 'B' & 'D' ).

38.)    I was so mentally & physically exhausted, and restrained in such a painful way, that nothing could be "effectively" done to prepare for the start of my trial in less than 24 hours. Due to the "torture" I had, and was having, done to me at the jail, I could not think or concentrate on anything but fear. All I could talk about was the treatment I was getting and how scared I was.

39.)    Attorney Guzman tried to leave the documents & photos with me to go over in my cell, but this was not allowed. Attorney Guzman left but told me she would come back later that day. I was returned to the suicide cell. I was brought back to the attorney visit room at 7 PM in the same conditions as earlier.(see paragraph 37). After about 30 minutes attorney Guzman left. She was again told I could not have any of my legal documents or evidence. I asked her to call my mother and tell her what was happening to me at the jail, since I was not allowed to use the telephone. I was 'escorted' back to the suicide cell for the night. Again, the officers kicked my door repeatedly through the night denying me sleep.

40.)    I was fed breakfast and allowed to shower. I asked for a razor to shave with, but was not allowed one. I was given my eye-

12

glasses and a orange jumpsuit and escorted to a van by the same "move team" that moved me on 03/09/07. They were again in full "riot gear" and carrying weapons. I was transported to the Courthouse all by myself.

41.)    The "move team" entered the courtroom and stated that they wanted to stay in the courtroom during the trial. Judge Fecteau had the sereant of the team take the stand and explain why the team was being used on me, and why they wanted to stay in the courtroom during my trial. The ONLY explanation was that I had not wanted to spend the weekend at the jail and that the "move team" was forced to carry me on friday. This testimony was recorded by the court reporter on 03/12/07.

42.)    Judge Fecteau asked if I had fought the officers or acted out in ANY other way. He was told that I did **NOT**. He also told the court that I had been placed in restraints on 03/09/07--03/10/07. Judge Fecteau asked me if I was going to cause any problems. I told him that I had never caused a problem in court over the past 5 years. The court officer & attorney Guzman also told the court that I had never been a problem with them.

43.)    After hearing all this, Judge Fecteau told the "move team" that if they changed into "civilian" clothing and put away their weapons, they could sit in the courtroom. The team did not want to change, or put down their 'toys', so they left. The day was spent picking the jury. No 'incidents' occurred. I was taken back to the jail.

13

44.) At the jail I was forced to put the 'burlap' robe back on and all of my legal documents were taken from me. My eye-glasses were again taken from me, and I was escorted back to the "suicide cell" I was in earlier. I saw no-one from "Mental Health." I had also missed supper at the jail, and was given a boloney sandwich. I also asked if I could have my medication.and use the telephone. Both requests were denied.

45.) I spent the night in this cell, taunted & harrassed by the officers as the nights before. Attorney Guzman did not visit me. I managed to get a "hygiene kit" in receiving, but it was taken from me in A-1. (kit: toothpaste, toothbrush, soap, razor,ect...)

46.) I was given breakfast, but NOT allowed to shower before leaving for court. I was transported to court with the 'general population' inmates. I was dirty, disheveled, tired, smelly and upset. I told attorney Guzman that I could not stand this abuse any longer, and I was going to tell the court so it would be on the record. She told me not to say anything, that she would tell the court what was happening at the jail.

47.) Attorney Guzman told Judge Fecteau how I was being treated at the jail. He asked a court officer to find out why the jail was treating me this way. Why I could'nt have my eye-glasses, legal papers or hygiene items? All other detainees can have these items.

48.) Later that day, the court officer told Judge Fecteau that

14

"everything has been cleared up" and I would be treated normally. I could have my legal papers, eyeglasses and be allowed to brush my teeth, shave and shower. At the end of the day, I took several documents, motions, ect... back to the jail with me. I really needed to review the report written by the Commonwealth's psychologist which I had just received.

49.) Upon arrival at the jail, all of my legal work, eye-glasses and clothing was taken from me, I was put back in the 'burlap robe' and escorted back to the "suicide cell" in A-1. I asked for a phone call and was denied. I had missed supper again and was forced to eat another baloney sandwich, and drink hot water for supper. I also saw no-one from 'Mental Health'.

50.) Attorney Guzman visited me at about 7 PM on 03/13/07. I was brought out in full restraints, in the robe, without my eye-glasses. Attorney Guzman asked to see a 'superior officer'. Lieutenant Fazzio came to the attorney visiting room. He said that no-one had ordered any changes to my treatment. He knew nothing of the court's phone call and would continue treating me the same way. I requested to see the 'commanding officer'. (see exhibit 'D' ).

51.) A Captain arrived a few minutes later. He also told me, in attorney Guzman's presence, that no changes had be ordered to my treatment status. I requested 2 grievance forms. ( Jail policy is that only captains give out grievance forms. They "prescreen" the complaints and only give out the forms when they feel like it. Without the form, you cannot file a grievance.) He asked me what

15

I wanted the grievance forms for? I told him I wanted to grieve the loss of my new sneakers, and to grieve the illegal use of restraints on me, and the illegal & unwarranted treatment I was receiving.

52.)   The captain told me he would look for my sneakers, and that I **could not** grieve the use of 4 point restraints or the treatment I was receiving because it was a "Disciplinary" matter, and and as such, not greivable.

53.)   I asked him what I was being "disciplined" for? Where was my "disciplinary report?" My hearing? My Due Process of law? I received no response to these questions, and the captain and Lt. Fazzio left the attorney visiting room. I was not given any grievance forms. I never got my sneakers back.

54.)   I spoke to attorney Guzman for a few more minutes, but most of this conversation was about my treatment at the jail and how it was denying me my right to a fair trial. Very little time was spent discussing trial strategy/preparation, ect...

55.)   When the visit was over, one of the "move team" officers came to escort me back to my "suicide cell". He asked me how my trial was going, and how long it was going to last. I was dumb enough to answer this question. I told him things were going as good as they could be, and that my trial may run into the following week.

56.)   He yelled,"I don't give a sh*t how your trial is going you

16

piece of sh*t, I wished you'd kill yourself! 'We' are going to have so much fun if you spend the weekend with us. We'll just say you spit at an officer and then we can put you back in the 4 point restraints. Things are alot easier to get away with on the weekends. We'll all have a great time."

57.)    I was locked back in my "suicide cell" for the night. My sleep was continuously interrupted through-out the night. My anxiety was really bad, all I could think about was being put back in those restraints and what the "move team" members would do to me over the entire weekend. I was having panic attacks. I knew I could not stand another day or more in those restraints.

58.)    Upon arrival at Worcester Superior Court on 03/14/07, I was told to hurry up and change clothes cause the court was waiting to get started, jail transport had got me to the jail late. I told the court officer that I needed to see my attorney before I would change my clothes.

59.)    When attorney Guzman came to the lock-up, I told her I wanted to plead out. I could not handle trial anymore. What was the point? I told her I did'nt even care what the Commonwealth wanted for a sentence. Life was fine with me! She went and spoke to the A.D.A. and came back to tell me what the deal was.

60.)    I was brought out before the court and took the stand. The plea colloquy began and I started to cry. I told the court that

17

I suffered from mental illness, and that I had benied my medications for days. The court was aware of the abuse I was receiving at the jail and was not to concerned about it. I knew if I said anything about it my pleas might be rejected, and I would be returned to the jail where the "move team" officers could "torture" me more. That was not an option. My pleas were accepted and I got (2) Life (2nd degree) sentences, (2) 20-25 yr sentences, (2) 9-10 yr sentences and (2) 4-5 year sentences all running concurrently. Off I went to MCI-Concord for processing.

61.) I wanted the 'life' sentences because I just wanted to get away from the Worcester Jail and get back to my cell at SBCC where I felt safe. I had already done 5 years without being convicted of any crimes so I really did'nt see any change by pleading guilty. I went right back to where I was 'without' being guilty. What was the difference?

62.) At MCI-Concord, during my "booking in", I was questioned about the lacerations to my head & wrists. I told them how I had gotten them and showed the C.O. the injuries on my ankles. The "I.P.S." were called to document these injuries. Photos were taken with a digital camera.

63.) Later that day I was interviewed by a Mental Health worker at MCI-Concord. This counselor knew me well, as she was my counselor when I was in MCI-Concord in 2002 & 2003. She wrote a report detailing what had been done to me, why I plead guilty, ect... She personally knew that I was totally against pleading guilty. I

18

**had** told her as much numerous times over the years. (See Exhibit 'B'   ).
I was immediately put back on my psychiatric medications. I spoke
with her 2 more times while I remained at MCI-Concord waiting to
get sent back to SBCC. She instructed me to file a complaint with
the Dept. of Mental Health concerning the illegal way in which the
Worcester County Jail had used the restraints, and the "torture"
that I had endured. I did so.(See Exhibit 'B'   ).

64.)     As soon as I got back to SBCC and was given my property.
( writing paper, stamps, pens, envelopes and my legal documents &
addresses) I completed and mailed my grievances to the Worcester
County Jail, directly to Sheriff Glodis, to DOC Headquarters, to
Mass Corr Legal services and to attorney Guzman.(See Exhibits

'A' & 'B'  ). A detailed letter is included in these documents
further explaining what was done to me at the jail from 03/09/07
to 03/14/07. This letter was attached to my grievances.

65.)     My grievances and appeals have been denied. I have informed
Sheriff Glodis of my intent to bring this action against him and
his employees for numerous violations of my Civil Rights. I have
requested that he provide me with the names of the officers in the
"move team" and the 2 nurses that examined me, but these requests
have been ignored. Discovery procedures will be the only way the
Sheriff will provide me with the evidence I need to further prove
my claims.

66.)     I have also sent several letters to John O'Neill, MSW,
LICSW (defendant #11) asking him to explain the lack of basic

19

information in his examination notes and the numerous discrepancies
therein.(See Exhibits   'B'    ). I have received no responses to
any of these letters.

67.)    The plaintiff spent 59 months of pre-trial detention in
several different jails & prisons through-out Massachusetts. This
lengthy detention, constant moving and 9 changes of counsel have
severely 'handicapped' his ability to receive a fair trial. The
plaintiff was subjected to this, and the torture at the jail, for
1 simple reason. He could not **BUY** his freedom as most other people
with the same, or worse, charges are allowed to do every day.

68.)    At all times mentioned in this complaint, each & every
defendant, acted under the color of state law.


## IV.   EXHAUSTION OF GRIEVANCE SYSTEM

69.)    plaintiff, Anthony M. Leo, states that he has used the
grievance system available to him at the Worcester County Jail. His
grievances, and appeals, were all denied.(See Exhibits   'A'     ).
As such, He has "exhausted" his administrative remedies as required
by 42 USCA§1997e and MGL.c.127§38F.

## V.    LEGAL CLAIMS

**70.)**   At all times relevant to these claims, the plaintiff was a
pretrial detainee, and as such, has a 5th & 14th amendment (US) right
to be free from 'punishment' prior to conviction. Any act or practice
that violates the 8th amendment (US), also violates the 'Due Process
Clause' rights of a pretrial detainee.

## COUNT ONE
### 'EXCESSIVE FORCE'
### 'CRUEL & UNUSUAL PUNISHMENT'

**71.)**   The plaintiff realleges and incorporates by reference paragraphs
1— 70 into these claims.

**72.)**   On 03/09/07, defendants in paragraphs # 3, 4, 5, 6, and 7
(constituting a "move team") used 'excessive force' against the
plaintiff by their conduct in paragraphs 20, 21 and 22. This 'excessive
force', used against a passively resisting detainee, was used solely
to 'maliciously & sadistically' to cause pain.

**73.)**   The conduct by the "John Doe" officer that drove the county
jail van transporting the plaintiff back to the Worcester County Jail
in paragraph #23, was done with 'deliberate indifference' to the
obvious risk of serious harm to the plaintiff, and did indeed injure
the plaintiff by his actions.

**74.)** The conduct by the "move team" defendants in paragraphs #24 and 25 constituted 'excessive force'. This force was unwarranted, not used in 'good faith' and with the sole intent to harm, and punish, the plaintiff.

**75.)** The conduct by the "move team" defendants in paragraphs #25, 26, 27, 28, 29, 30, 32, 33 and 34 placing the plaintiff into " 4 point restraints" deprived him of "liberty" without due process of law, constituted 'excessive force' and was "cruel and unusual" in violation of the 8th amendment (US) by, among other things:

> **A.)** Forcing the plaintiff into restraints, using steel cuffs and shackles with leather straps, cutting the plaintiffs clothing off, leaving hood over his head and securing helmet over it and securing the restraints so tight as to cut off blood flow to his extremities.

> **B.)** Leaving plaintiff, almost naked, under open windows in winter time. Providing no blanket for over 24 straight hours.

> **C.)** Not providing the plaintiff with food or water for over 24 straight hours.

> **D.)** Not allowing the plaintiff to use a toilet for over 24 straight hours, causing him to urinate on himself & lay in it.

> **E.)** Not allowing plaintiff to stretch his arms or legs during more than 24 hours in restraints, causing severe

muscle cramps & spasms, hence intense pain.

F.) Denying the plaintiff medical care for his lacerated head wounds, and providing almost no medical monitoring, control or supervision of the plaintiff while he was secured in restraints.

G.) Hiding of 'restraint beds' in a corner of the Disciplinary Unit where almost no-one can see or hear what is being done to the restrained, and extremely vulnerable, individuals. The failure to place video camera monitoring and recording for the restrained individuals.

H.) Using "4 point restraints" for no reasonable purpose, continuing to use them without any penological justification. Using restraints as summary, informal, unofficial and unsanctioned "corporal punishment."

I.) The conduct by the "move team" defendants in spitting on , degrading, using vulgarities to taunt the plaintiff, threatening him with 'sexual' assault and death, and lauphing at him while he pleaded for mercy rises to a level of atrocious behavior and gross abuse of power towards the plaintiff which constituted "torture and barbarous" acts .

76.) This use of excessive force and cruel & unusual punishment also violates ART. 1, 10, 12, 14 and 26 of the Massachusetts Bill of Rights, MGL.c123§21, MGL.c127§39, MGL.c127§41, 103 Code Mass Regs

**80.)** Mr. O'Neill was also made aware of the plaintiff's need for his prescribed psychiatric medications for Magor Depression and Anxiety Disorder. The plaintiff explained that he took large doses of these meds and if abruptly stopped he would experience withdrawl symptoms. Some quite physically & mentally painful. (See exhibit 'B' ).These meds also cause severe dry mouth & thirst. Knowing all this, in addition to what the plaintiff had been through in the prior 24 hours, the stress & anxiety it would cause, the plaintiff NEVER received any of his prescribed medications. This shows 'deliberate indifference' to the plaintiff's mental health & medical needs and caused unnecessary pain and suffering to the plaintiff.

**81.)** In paragraph #31, Mr. O'Neill told the plaintiff that he did NOT need to be placed on an "A-Watch" for risk of suicide. But, later that same day(see paragraph #34) the plaintiff was released from the "4 point Restraints" and placed on an "A-Watch" for high risk of suicide. Plaintiff was told this was ordered by Mr. O'Neill. If this is true, it was not done in good faith and without using professional judgement. Plaintiff was put on an "A-Watch" as a way to circumvent jail procedures & Due Process of Law to arbitrarily punish him. ( A deliberate intent to punish).

**82.)** As you can see in paragraphs #35, 36, 37, 38, 39, 40, 44, 45 , 46, 49, 50, 55, 56 and 57, being placed on an "A-Watch" at the jail forces the individual to endure oppressive, inhumane and deplorable living and treatment conditions. These conditions are worse than the living conditions a "sentenced" inmate would be given

**after** being found guilty of major jail infractions. (Punishment).
The plaintiff here, suffered these inhumane and demoralizing
conditions for 5 days, while he was on trial. He also suffered
continuous 'torture' at the hands of the "move team" officers who
worked in, or close to, the A-1 & A-2 housing units. This was
nothing more than arbitrary infliction of 'cruel and unusual
punishment' for the defendant's enjoyment.

83.) These appalling living conditions, and the denial of soap,
showers, toothbrush, toothpaste, razor and sanitary toilet facilities
in addition to the denial of the plaintiff's prescription eyeglasses
, seizing his legal documents, denying him telephone access, out
of cell time to exercise and access to his attorney violates the
the 1st, 4th, 5th, 6th, 8th and 14th amendments of the US Const,
ART. 1, 10, 12, 14 and 26 of the Mass Bill of Rights. It also
violates MGL.c.127§36A, MGL.c.111§21 and 103CMR 486.09, §926.04,
§932.13, §974.08, and almost every § of 105CMR 451.(see exhibit'C' ).

84.) "John Doe" defendant in paragraph #8 is the 'supervising'
officers that ordered/approved of the aforementioned 'excessive
force' and 'cruel & unusual punishment'. These defendants knew
that what was being done to the plaintiff, a pretrial detainee, was
officially, legally, morally and constitutionally wrong. The
'supervising' officers knew this and failed to take ANY remedial
steps, or to control their officers. This conduct constitutes
'deliberate indifference', and/or 'gross negligence' by failing
to act.

## COUNT TWO
## 'DUE PROCESS OF LAW'

85.)    The plaintiff realleges and incorporates by reference paragraphs 1— 84 into these claims.

86.)    The 'excessive force' and 'cruel & unusual punishment' claims set forth in paragraphs 71-84 were done to the plaintiff without ANY 'procedural due process'. The plaintiff received no written disciplinary charges, was given no hearing before he was severely punished/disciplined. This does not comply with 103 CMR §900.00 through §999.00 and jail policy.

87.)    Considering the "totality of the conditions/sanctions" the plaintiff was forced to endure, it can hardly be said that such harsh, tormenting and horrendous conditions can be imposed on a pretrial detainee without some procedural safeguards. This treatment is **much worse** than what other pretrial detainees are subjected to at the jail. These conditions are worse than the harshest punishment a sentenced inmate can get as punishment after being found guilty of serious offenses. As such, this appalling treatment is punishment without due process on a pretrial detainee. If this could not be done to a sentenced inmate, it CANNOT be done to an "innocent" pretrial detainee.

88.)    The conditions in paragraphs #30, 37, 38, 39, 44, 49, 50, and 54 violated the plaintiffs Due Process rights to "effectively" prepare his case for trial and to consult with my attorney. (See exhibit C & D ).

27

**89.)**    The statement by the Jail Captain in paragraph #52, made to the plaintiff in the presence of his attorney, Margaret Guzman, proves that the treatment I was subjected to was for "Disciplinary" purposes. (PUNISHMENT). This Captain also refused to provide me with 'grievance forms' so that I could attempt to seek redress for the violations committed against me through the jail's 'administrative' remedies system. This "John Doe" Captain violated my Due Process rights. This conduct also does not comply with MGL.c.127§38F, 103 CMR§943.01, §934.02, §943.04, §943.05, §943.06, §943.09.

## COUNT THREE

### 'ACCESS TO THE COURTS'

**90.)**    The plaintiff realleges and incorporates by reference paragraphs 1-89 into these claims.

**91.)**    By denying the plaintiff, a pretrial detainee, of his legal documents, writing implements, paper, telephone access and access to his attorney immediately before, and during, his trial, the plaintiff's First amendment rights 'To Access of the Courts' was violated. This official interference with this "clearly established" right to prosecute/defend against court proceedings furthered NO legitimate penological objective. The defendants knew this and continued to do it.

**92.)** The conduct in paragraphs 25 through 58, denying the plaintiff access to his attorney immediately before his trial, the severe infringement of his attorney/client relationship by forcing him to confer with counsel almost naked in full restraints, without his eyeglasses, the denial of all telephone access and the illegal "seizure" of his legal documents, not only violates the plaintiff's constitutional rights, but also violates the concept of "fundamental fairness." This conduct also blatantly violates Code Mass Regs, ART.1, 10, 12, 14, and 26 of the Mass Bill of Rights and the Worcester County Jail's own policies.

### COUNT FOUR

### 'RIGHT TO COUNSEL'

**93.)** The plaintiff realleges and incorporates by reference paragraphs 1—92 into these claims.

**94.)** The 'supervising officer', and/or, Sheriff Guy Glodis refused to allow my attorney to see me on 2 seperate occasions. These meetings were extremely important as my trial was beginning in 2 days. When counsel finally was allowed to meet with the plaintiff, it was under conditions that made it impossible to effectively do anything.(See paragraphs 30, 37, 38, 39, 44, 48, 49, 50 & 54.) This unjustifiable obstruction and infringement on the plaintiff's right to "effective" assistance of counsel, at a "critical stage"

**98.)**    The 'supervising' officers of the "Main Jail", and the A-1 & A-2 housing units( defendant(s) paragraph #8) from 03/09/07 through 03/14/07, are liable for the aforementioned 'torture' and Constitutional violations suffered upon the plaintiff. These defendants approved of/ordered this treatment, they observed it, reviewed it and allowed it to continue. These defendants knew that they were violating rights that were "clearly established". This constitutes "deliberate indifference" to the plaintiff's rights and safety. These 'supervising' officers condoned the use of "4 point restraints" on pretrial detainees and sentenced inmates without providing them with ANY Due Process Safeguards for the **SOLE** intent to **punish.**

**99.)**    Each of the defendants in paragraphs #3, 4, 5, 6, 7, 8, as well as defendants in paragraphs #9, 10 and 11 are all guilty of "bystander liability" as they all personably saw what was being done to the plaintiff, knew it was obviously wrong, and either continued to do it, or did NOTHING to correct it or stop it. They violated their duty as law enforcement officers, as health care providers and to their office/rank to supervise their subordinates.

**100.)**    Sheriff Guy Glodis (defendant #2 paragraph) is liable for the same reasons set out in paragraphs 98 & 99. He is responsible for the orderly & just running of the Worcester County Jail. The plaintiff was ordered into "His Care." Sheriff Glodis condones the use of restraints as punishment without Due Process of Law. He has added at least 4 to 6 of these "restraint beds" installed in the

31

jail since becoming sheriff in 2005. He has failed in his duty to "implement, monitor and enforce 103 CMR §§ 900.00 through 999.00 as the law requires. He has failed to protect the safety of the individuals that he puts in restraints by not installing video cameras to record the treatment of the restrained, and extremely vulnerable individuals. Almost no medical supervision is provided to individuals in restraints, and they can be used without a doctors authorization.

**101.)**  Sheriff Glodis has failed to train the officers of his "move teams" on using 'excessive force', on when and how to use '4 point restraints' or on the legal differences between inmates and pretrial detainees. He has also failed to train the officers that he assigns to work in the "mentally ill/suicide unit" on the proper way to handle mentally ill individuals. He has also failed to enforce the policies that he already has.

**102.)**  Sheriff Glodis is also personally required by law and CMR to authorize, and/or, review all cases requiring the 'use of force'. He is also under the same obligation when restraints are used. He is responsible for denying visits in his jail, especially attorney visits. In this type of case he either personally ordered, or approved, of the conduct used against the plaintiff in paragraphs 1— 96, or he failed to follow state law, CMR or his own policies.

**103.)**  Sheriff Glodis has failed to implement procedures to ensure that mentally ill individuals get their prescribed medications as soon as possible, and that these mentally ill individuals are

32

are treated humanely, and that the conditions of their confinement while on suicide watches are sanitary, dignified and provide the minimal civilized measures of life's necessities. Sheriff Glodis knows of ALL these failures to follow "clearly established" Civil rights, Federal & State Laws, Regulations and his own policies, but he has chosen to ignore them.

**104.)**    These failures by Sheriff Glodis show that he is/was so reckless, and 'grossly negligent' that deprivations of Constitutional rights, and increased risk of harm were certain to result. Sheriff Glodis was aware of, acquiesed in, a pattern of Constitutional violations by not properly training his officers, or enacting and enforcing state law and jail policies which protect detainees and inmates in "his" custody from the kind of appalling and alarming violations that took place in this case. Sheriff Glodis tolerated this behavior. (TACIT LIABILITY). He has failed to meet,& enforce, the Dept of Public Health Regs.(see exh 'C'). The report proves that the jails conditions fall **below** the minimun standards of decency. These violations have persisted for years and have not been fixed.

## COUNT SIX

### 'MASSACHUSETTS CIVIL RIGHTS ACT'

### MGL.c. 12§§ 11H and 11I

**105.)**    The plaintiff realleges and incorporates by reference paragraphs 1— 96 into these claims.

**106.)**    The conduct by defendants in paragraphs #2, 3, 4, 5, 6, 7, 8 and 11 violated the plaintiff civil rights pursuant to the

Massachusetts Civil Rights Act (MCRA hereafter), MGL.c.12§§ 11H & 11I. The numerous Constitutional violations that were committed against the plaintiff in paragraphs 16 through 61 were a direct result of the torture the defendant was subjected to. ( Threats, intimidation and/or coercion).

**107.)** As a result of this illegal/unconstitutional conduct by these 8 defendants, the plaintiff was forced to forfeit his rights to "effective assistance of counsel", "access to the courts", to "due process of law", to be free of "cruel & unusual punishment" and his rights to "atrial by a jury of my peers."

**108.)** These actions by these defendants formed a 'conspiracy' in which to torture the plaintiff as much, and for as long, as they could get away with. The comment made to the plaintiff in paragraphs #55 & 56 was a threat against the plaintiff. If he stayed at the jail throughout his trial, he was going to be tortured worse than he had already been. The plaintiff knew this was true, and there was no way to stop it. The plaintiff was so scared and exhausted by what he had been through the prior 5 days that all he cared about was escaping from his "tormentors." He was forced to waive his most precious constitutional rights and plead guilty to 2 "life" sentences.

**109.)** these defendants also intentionally inflicted emotional distress against the plaintiff for their own amusement. This torture was so bad that the plaintiff, or any reasonable person , could not endure it. This conduct was beyond all bounds of

decency, utterly intolerable in a civilized society and shocks the conscious. For these reasons, the plaintiff's protections under the MCRA were blatantly violated.

## COUNT SEVEN
## 'CONSPIRACY TO INTERFERE'
## 42USCA§ 1985(2) & (3)

110.). The plaintiff realleges and incorporates by reference paragraphs 1— 109 into these claims.

111.) The 5 "move team" defendants( paragraphs#3,4,5,6 & 7), and possibly John O'Neill (paragraph# 11) 'conspired'together to purposely torture the plaintiff and did cause him to forfeit his Constitutional rights to "escape" from their malicious and sadistic acts. The plaintiff was denied the 'equal protection' of the law by this treatment at the Worcester County Jail and into his trial proceedings. This 'conspiracy' caused the plaintiff to have his liberty taken from him for "life." This was done solely due to the plaintiff's demand for a trial by jury.

112.) These 'conspirators' denied the plaintiff of the 'equal protection' of the law, and/or, the privileges and immunities under the law by force, intimidation and threats. This action deprived the plaintiff from exercising his Constitutional rights as a citizen of the United States.

**113.)**    The plaintiff is a "class of one", and has been intentionally treated differently from other similarly situated persons
and there is NO rational basis for the difference in treatment.
The only reason the plaintiff was treated differently, and with
"illegitimate animus" (ill will) is due to the nature of the
charges the plaintiff was fighting, and because he made the "move
team" members carry him. The plaintiff was intentionally treated
differently with the intent to inhibit, **and punish,** him for
exercising his Constitutional rights. The defendants had a malicious
/bad faith intent to injure the plaintiff.

## VI.    PRAYER FOR RELIEF

Wherefore, plaintiff respectfully prays that this honorable
court enter judgement granting plaintiff:

**114.)**    A declaration that the acts and omissions described herein
violated plaintiff's rights under the Constitution and laws of
the United States and under the Constitution and laws of the
Commonwealth of Massachusetts.

**115.)** Compensatory damages in the amount of $25,000.°° against each defendant, jointly and severally.

**116.)** Punative damages in the amount of $50,000.°° against each defendant due to the high degree of reprehensibility of the defendants repeated misconduct.

**117.)** A jury trial on all issues triable by jury.

**118.)** Plaintiff's cost in this action.

**119.)** Any additional relief this court deems just, proper and equitable.

Dated: _Oct. 03, 2007_

Respectfully Submitted,

Anthony M. Leo
Anthony M. Leo, pro se
#W89456
P.O. Box 8000
Shirley, MA. 01464

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he is the plaintiff in the above complaint and that the information contained in the complaint is true and correct.
( 28USCA§1746; 18USCA§1621)

Executed at SBCC in Shirley, Ma. on _10/03/07_ .

Signature _Anthony M. Leo_